ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL
(DJ 2024-02C)

| | | |
|---|---|---|
| MARÍA LÓPEZ VÁZQUEZ, SANTOS VÁZQUEZ, MIRIAM LÓPEZ VÁZQUEZ, SALVADOR LÓPEZ VÁZQUEZ, NEFTALÍ PERULLERO LÓPEZ y SALVADOR DE JESÚS LÓPEZ FIGUEROA,<br><br>Apelada,<br><br>v.<br><br>MAYAGÜEZ MEDICAL CENTER, DOCTOR EMETERIO BETANCES, INC., h/n/c CENTRO MÉDICO DE MAYAGÜEZ; **DOCTOR RAMÓN COLÓN BERMÚDEZ**, FULANA DE TAL y la sociedad legal de gananciales COLÓN DE TAL; **doctora LIZMARY VÁZQUEZ LATONI**, JUAN DEL PUEBLO y la sociedad legal de gananciales VÁZQUEZ-DEL PUEBLO; **SINDICATO DE ASEGURADORAS PARA LA SUSCRIPCIÓN CONJUNTA DE SEGUROS DE RESPONSABILIDAD PROFESIONAL MÉDICO-HOSPITALARIA**; CNA; PR MEDICAL DEFENSE; TRIPLE-S PROPIEDAD; ASEGURADORA XYZ; CORPORACIÓN ABC; JOHN DOE,<br><br>Apelante. | KLAN202500515 | APELACIÓN procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez.<br><br>Civil núm.: MZ2019CV00652.<br><br>Sobre: daños y perjuicios; impericia médica. |

Panel integrado por su presidenta, la juez Lebrón Nieves, la jueza Romero García y el juez Rivera Torres.

Romero García, jueza ponente.

SENTENCIA

En San Juan, Puerto Rico, a 22 de octubre de 2025.

La parte apelante, compuesta por el doctor Ramón Colón Bermúdez (doctor Colón Bermúdez), la doctora Lizmary Vázquez Latoni (doctora Vázquez Latoni), y la aseguradora de ambos, el Sindicato de Aseguradoras para la Suscripción Conjunta de Seguros de Responsabilidad Profesional Médico-Hospitalaria (SIMED), presentaron dos (2) recursos de apelación el 6 de junio de 2025, y el 30 de junio de 2025[1], respectivamente. En ambos recursos, los apelantes nos solicitan que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Mayagüez, el 29 de abril de 2025, notificada el 30 de abril de 2025[2]. Mediante la misma, el foro primario declaró con lugar la demanda instada por la parte apelada del título.

Examinados los sendos escritos de las partes litigantes, la transcripción de la prueba oral y la evidencia documental y pericial admitida en el juicio en su fondo, este Tribunal revoca en parte la sentencia apelada, la modifica y, así modificada, la confirma.

I

Conforme surge del expediente, el 1 de mayo de 2019, los señores María López Vázquez, Santos López Vázquez, Miriam López Vázquez, Salvador López Vázquez, Neftalí Perullero López y Salvador De Jesús López Figueroa (en conjunto, los apelados) instaron una demanda sobre daños y perjuicios e impericia médica contra, entre otros, los apelantes y el hospital Mayagüez Medical Center, Doctor Emeterio Betances, Inc. (MMC u hospital)[3]. A grandes rasgos, los apelados le imputaron negligencia médica al hospital, a sus empleados y a los médicos apelantes por la

---

[1] El doctor Colón Bermúdez y su aseguradora presentaron el recurso KLAN202500515 en papel previo a que, el 16 de junio de 2025, entrase en vigor el nuevo Reglamento del Tribunal de Apelaciones, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, 215 DPR __ (2025), a los fines de implantar el *Sistema Unificado de Manejo y Administración de Casos* (SUMAC TA) en este Tribunal y, con ello, la tramitación de los recursos mediante dicha plataforma electrónica de manera prospectiva. Posteriormente, la doctora Vázquez Latoni y su aseguradora presentaron el recurso TA2025AP00063 por vía del SUMAC TA.

[2] La *Sentencia* original, emitida y notificada el 22 de abril de 2025, fue enmendada *motu proprio* por el foro apelado a los únicos efectos de añadir dos (2) fechas adicionales de juicio, que se habían omitido en dicha *Sentencia*; a decir: el 11 y 12 de enero de 2024.

[3] *Véase*, entrada 1, SUMAC TPI. Dado el volumen de los trámites procesales del caso, consultamos las entradas correspondientes al SUMAC de la acción civil MZ2019CV0062.

muerte de la señora Tomasa Vázquez Morales (doña Tomasa o paciente), dadas las acciones u omisiones de estos durante su estadía en la sala de emergencias del MMC durante el 18 al 19 de junio de 2018.

Tras varias incidencias procesales, el 12 de julio de 2019, SIMED, como aseguradora del doctor Colón Bermúdez, presentó su contestación a la demanda[4]. En esta, negó todas las alegaciones en su contra y planteó sus defensas afirmativas; entre ellas, que el doctor Colón Bermúdez había cumplido con las normas de atención médica generalmente exigidas en Puerto Rico, y que había ejercido en todo momento el grado de cuidado que se le requiere, según la mejor práctica de la medicina. Simultáneamente, SIMED negó que existiera solidaridad entre ella y su asegurado.

El 30 de julio de 2019, el MMC presentó su contestación a la demanda, enmendada el 5 de agosto de 2019[5], mediante la cual negó todas las imputaciones de negligencia en su contra. Posteriormente, el 30 de agosto de 2019, el doctor Colón Bermúdez presentó su contestación a la demanda[6]. En esta, reprodujo las mismas alegaciones contenidas en la contestación a la demanda presentada por SIMED.

Por su parte, el 9 de septiembre de 2019, la doctora Vázquez Latoni y SIMED, como su aseguradora, presentaron su contestación a la demanda[7]. En síntesis, negaron todas las alegaciones en contra de la doctora Vázquez Latoni. Como parte de sus defensas afirmativas, arguyeron, entre otras cosas, que el manejo y diagnóstico brindado a la paciente fue uno adecuado, y que la condición de esta última era irreversible e irreparable al momento de la intervención médica de la doctora apelante.

---

[4] *Véase*, entrada 21, SUMAC TPI.

[5] *Íd.*, entradas 26 y 27.

[6] *Íd.*, entrada 41.

[7] *Íd.*, entrada 42.

Luego de numerosos trámites procesales, el 23 de febrero de 2021, los apelados presentaron una demanda enmendada[8]. Consecuentemente, el MMC y los apelantes presentaron sus correspondientes contestaciones a la demanda enmendada mediante escritos fechados el 4 de febrero de 2022 y el 14 de febrero de 2022, respectivamente[9].

Así las cosas, el 10 de abril de 2023, los apelados presentaron una moción intitulada *Moción en solicitud de desistimiento parcial a favor del Mayagüez Medical Center Doctor Emeterio Betances, Inc.*, mediante la cual solicitaron el desistimiento con perjuicio de su reclamación contra el MMC, en virtud de un acuerdo transaccional[10]. A tales efectos, el 11 de abril de 2023, notificada el 14 de abril de 2023, el foro primario dictó *Sentencia Parcial* mediante la cual declaró con lugar la solicitud de los apelados[11]. Por virtud de esta, decretó el archivo de la demanda por desistimiento con perjuicio en cuanto al MMC.

El 27 de junio de 2023, culminado el descubrimiento de prueba, las partes litigantes presentaron el *Informe de conferencia con antelación al juicio*[12]. Este informe fue aceptado por el foro apelado mediante una resolución emitida el 27 de junio de 2023, notificada el 6 de julio de 2023[13]. Tras otros trámites procesales y la estipulación de la prueba, el juicio en su fondo se celebró en las siguientes fechas: 11 y 12 de enero de 2024; 25 y 26 de marzo de 2024; 4 y 5 de abril; 27 y 28 de junio; y 1 de julio de 2024.

Los apelados presentaron los testimonios de los señores María López Vázquez, Santos López Vázquez, Salvador López Vázquez y Neftalí Perullero López, así como el del doctor Juan Colón Padilla, médico

---

[8] *Véase*, entrada 122, SUMAC TPI. La enmienda a la demanda corresponde a la sustitución del codemandante señor Salvador López Guzmán - viudo de doña Tomasa y fallecido durante el transcurso del pleito - por sus herederos, quienes ya figuraban como codemandantes en el presente caso.

[9] *Íd.*, entradas 208, 209 y 210.

[10] *Íd.*, entrada 240. El acuerdo transaccional fue sometido por los apelados ante el foro primario, a los fines de mantener el expediente judicial completo.

[11] *Íd.*, entrada 241.

[12] *Íd.*, entrada 245.

[13] *Íd.*, entrada 246.

internista y de cabecera de la paciente, y el de su perito, el doctor Edwin Miranda Aponte (doctor Miranda Aponte). Por su parte, los apelantes presentaron los testimonios de los doctores apelantes, el doctor Colón Bermúdez y la doctora Vázquez Latoni, así como el de sus respectivos peritos, el doctor Carlos A. Gómez Marcial (doctor Gómez Marcial) y la doctora Migdalia Nieves Cabán (doctora Nieves Cabán), respectivamente.

El 29 de abril de 2025, notificada el 30 de abril de 2025, el Tribunal de Primera Instancia emitió la *Sentencia* objeto de este recurso[14]. En síntesis, el foro *a quo* concluyó que el personal del MMC y los doctores apelantes fueron solidariamente responsables y negligentes en el manejo y tratamiento de doña Tomasa. A su vez, procedió a adjudicar los porcientos de responsabilidad entre los demandados y determinó que, por los hechos alegados en la demanda, **el MMC fue responsable en un cuarenta y tres por ciento (43%)**, **el doctor Colón Bermúdez en un veintiocho punto cinco por ciento (28.5%)**, y **la doctora Vázquez Latoni en un veintiocho punto cinco por ciento (28.5%)**. Finalmente, determinó que SIMED respondía solidariamente conforme a los términos y condiciones de la póliza expedida a favor de los doctores apelantes.

En desacuerdo, el 7 de mayo de 2025, el doctor Colón Bermúdez, junto a SIMED, presentó una moción intitulada *Solicitud de determinaciones de hechos y de derecho adicionales bajo la Regla 43.1 de Procedimiento Civil y solicitud de reconsideración bajo la Regla 47 de Procedimiento Civil*[15]. No obstante, esta fue declarada sin lugar por el foro primario mediante una resolución interlocutoria notificada el 9 de mayo de 2025[16].

---

[14] *Véase*, entrada 319, SUMAC TPI.

[15] *Íd.*, entrada 324.

[16] *Íd.*, entrada 326.

Por su parte, el 15 de mayo de 2025, la doctora Vázquez Latoni y su aseguradora SIMED presentaron de manera individual otra moción en solicitud de reconsideración y de determinaciones de hechos adicionales[17]. El 19 de mayo de 2025, el foro primario emitió una resolución y orden mediante la cual concedió un término de veinte (20) días para que los apelados expusieran su posición en cuanto a la solicitud de la doctora apelante[18].

El 22 de mayo de 2025, los apelados presentaron su correspondiente oposición a dicha moción de reconsideración[19].

El 30 de mayo de 2025, el foro primario notificó una resolución mediante la cual declaró sin lugar la solicitud de reconsideración presentada por la doctora apelante y su aseguradora[20].

Inconforme, los apelantes, el doctor Colón Bermúdez y SIMED, instaron su recurso de apelación el 6 de junio de 2025, y señalaron la comisión de los siguientes errores:

> Erró el TPI al descartar, no considerar y omitir en sus Determinaciones de Hecho de su Sentencia el contenido de los récords médicos estipulados y sustituirlo por su opinión personal de lo que indican los mismos.
>
> Erró el TPI en su Sentencia al convertirse en Juez, Parte y Perito Médico obviando el testimonio de dos (2) médicos demandados y la única literatura médica sometida, acreditativa de cuándo es el momento en que se ordena la transfusión de sangre.
>
> Erró el TPI en su Sentencia al darle credibilidad al perito de la parte demandante en su Sentencia en una sola determinación (#89), sin mencionar tan siquiera sus pobres cualificaciones profesionales.
>
> Erró el TPI en la apreciación de la prueba presentada, cometiendo claro y craso error manifestó al aquilatar toda la prueba presentada, lo que no representa el balance más justiciero y jurídico de la totalidad de la prueba presentada.
>
> Erró el TPI en su Sentencia, al determinar que el doctor Colón Bermúdez se apartó de la mejor práctica de la medicina, sin analizar en su Sentencia la prueba pericial desfilada por la parte compareciente.

---

[17] *Véase*, entrada 328, SUMAC TPI.

[18] *Íd.*, entrada 329.

[19] *Íd.*, entrada 331.

[20] *Íd.*, entrada 333.

Erró el TPI en su Sentencia al determinar solidaridad.

También inconformes, la doctora Vázquez Latoni y SIMED instaron su correspondiente recurso de apelación el 30 de junio de 2025, y señalaron la comisión de los siguientes errores:

Erró el Tribunal de Primera Instancia al adjudicar responsabilidad por alegada impericia médica sin realizar un análisis ponderado y detallado de toda la prueba pericial desfilada, incluyendo el testimonio y el informe de la doctora Migdalia Nieves Cabán, emergencióloga certificada, que acreditó que la actuación de la doctora Vázquez Latoni fue conforme a los estándares nacionales de cuidado médico en sala de emergencias.

Erró el Tribunal al conferir credibilidad prevalente al perito de la parte demandante sin emitir determinaciones específicas sobre su cualificación, ausencia de licencia activa y carencia de referencias a guías objetivas o literatura nacional reconocida, contrariando la norma establecida en Rodríguez Crespo v. Hernández, 121 DPR 639 (1988).

Erró el Tribunal al concluir que la presunta omisión de la doctora Vázquez Latoni fue la causa próxima y determinante del fallecimiento de la paciente, a pesar de la evidencia documental y pericial que demostró que el desenlace obedeció a un proceso hemorrágico catastrófico irreversible, y que la intervención de la doctora se limitó a un periodo de 46 minutos durante el cual se proveyó manejo adecuado.

Erró el Tribunal al ignorar la presunción de corrección profesional que cobija a los médicos demandados, y al imponer responsabilidad mediante conjeturas y apreciaciones subjetivas, en contravención de la doctrina expuesta en Arrieta v. Doctor de la Vega, 165 DPR 528 (2005).

Erró el Tribunal al imputar negligencia a la doctora Vázquez Latoni por ordenar la sedación de la paciente y un CT de cráneo ante un cambio súbito de estado mental, sin evaluar la razonabilidad clínica de realizar una evaluación diferencial de causas neurológicas, conforme a la mejor práctica de la medicina de emergencia.

Erró el Tribunal al omitir determinaciones de hecho esenciales sobre la condición clínica de la paciente al inicio del turno, la secuencia de actuaciones previas, y la responsabilidad de otros profesionales que intervinieron en su manejo, todo lo cual resultaba indispensable para fundamentar una sentencia válida.

Erró el Tribunal al imponer responsabilidad solidaria a SIMED en ausencia de pacto expreso o disposición legal que sustente dicha solidaridad, en contravención de la doctrina reiterada en Almonte Mejías v. Díaz, 86 DPR 111 (1962).

Erró el Tribunal al denegar la moción de reconsideración y la solicitud de determinaciones adicionales sin emitir resolución fundamentada, con lo cual se privó a la parte apelante de su derecho al debido proceso y se frustró la adecuada revisión apelativa.

El 10 de julio de 2025, emitimos una *Resolución* mediante la cual determinamos que los recursos presentados separadamente por los apelantes se tramitarían de manera conjunta, a pesar de que no podrían consolidarse formalmente por haberse instado en formatos diferentes. Además, determinamos que los apelantes y los apelados podrían presentar sus alegatos suplementarios y sus respectivas oposiciones dentro de los términos que dispone nuestro reglamento a tales efectos[21].

El 13 de agosto de 2025, los apelados presentaron simultáneamente sus alegatos en oposición a ambos recursos. Posteriormente, los apelantes presentaron sus correspondientes alegatos suplementarios el 26 y 27 de agosto de 2025, respectivamente. Finalmente, el 4 de septiembre de 2025, los apelados solicitaron a este Tribunal que considerara sus alegatos en oposición como alegatos suplementarios, toda vez que en los mismos hicieron referencia directa a la transcripción de la prueba oral estipulada (TPO).

Examinados los escritos de las partes, resolvemos.

II

A

La responsabilidad civil por malas prácticas de la medicina, como consecuencia de la impericia o negligencia de un facultativo, emana del Art. 1802 del Código Civil de Puerto Rico. *López v. Doctor Cañizares*, 163 DPR 119, 132 (2004)[22]. El Art. 1802 establece que "aquel que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". 31 LPRA sec. 5141.

Así pues, para imponer responsabilidad civil a un médico por actos de impericia al amparo del referido estatuto, es necesaria la concurrencia de los siguientes requisitos: (1) la presencia de un daño físico o emocional

---

[21] Este Tribunal permitió la presentación de dichos alegatos luego de haber autorizado la solicitud de los apelantes para presentar la transcripción de la prueba oral estipulada mediante nuestra *Resolución* emitida el 12 de junio de 2025.

[22] A pesar de que el Código Civil de Puerto Rico, Ed. 1930, fue derogado efectivo el 28 de noviembre de 2020, por el Código Civil de Puerto Rico de 2020, Ley Núm. 55 de 1 de junio de 2020, hacemos referencia al primero, pues le aplica a la controversia de autos, dado a que los hechos pertinentes a esta acción se suscitaron durante la vigencia del derogado Código Civil.

en el demandante, (2) que haya surgido a raíz de un acto u omisión culposa o negligente del demandado, y (3) que exista un nexo causal entre el daño sufrido y dicho acto u omisión. *López v. Doctor Cañizares*, 163 DPR, a la pág. 132.

Por lo tanto, para prevalecer en su reclamo, la parte demandante deberá establecer "por preponderancia de la evidencia - creída por el juzgador - que el daño emergente fue causado por los actos de negligencia, falta de cuidado o impericia del médico". *Sáez v. Municipio de Ponce,* 84 DPR 535, 543 (1962).

Consecuentemente, "el deber de cuidado exigible consiste en la obligación de todo ser humano de anticipar el peligro de ocasionar daños cuya probabilidad es razonablemente previsible". *López v. Doctor Cañizares*, 163 DPR, a la pág. 132. No se requiere que el daño haya sido previsto de la manera exacta en que ocurrió. Es suficiente con que este sea una consecuencia natural y probable del acto u omisión negligente. *Tormos Arroyo v. D.I.P*, 140 DPR 265, 276 (1996).

En cuanto al deber de cuidado de los médicos, el Tribunal Supremo de Puerto Rico ha expresado que,

> [...] "éstos vienen en la obligación de brindar a sus pacientes aquella atención que, a la luz de los modernos medios de comunicación y enseñanza", y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, "satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica".

*López v. Doctor Cañizares*, 163 DPR, a la pág. 133. (Notas al calce suprimidas).

Con relación al peso de la prueba en casos de impericia médica, este recae sobre el demandante, que deberá probar mediante prueba pericial, cuáles son las normas mínimas de conocimiento y cuidado médico. *Íd.* Una vez establecidas, el demandante también deberá probar que la parte demandada incumplió con las normas en el tratamiento del paciente y que ello causó el daño alegado. *Íd.*, a las págs. 133-134. Ello, pues "´[n]uestro ordenamiento obliga al médico a responder por los daños y perjuicios causados tan *sólo cuando* actúa negligentemente, con descuido

o falta de pericia profesional que exigen las circunstancias´". *López v. Doctor Cañizares*, 163 DPR, a la pág. 134. (Énfasis en el original).

Por ello, la negligencia no se presume por el hecho de que el paciente haya sufrido un daño. *Íd.* Así pues,

> […] al evaluar una acción en daños por alegada impericia médica debemos tener presente que a los médicos les cobija una presunción en cuanto a que éste ha ejercido un grado razonable de cuidado y el tratamiento fue el adecuado. Por lo tanto, el demandante debe derrotar dicha presunción mediante preponderancia de la prueba, demostrando que el médico fue negligente y que dicha conducta negligente fue el factor que con mayor probabilidad causó los daños alegados. La negligencia del médico no se presume por el hecho de que el paciente haya sufrido un daño o que el tratamiento no haya tenido éxito. De igual forma, la parte demandante no podrá descansar, para rebatir la presunción de corrección a favor del médico, en una mera posibilidad de que el daño se debió al incumplimiento del médico de su obligación profesional. La relación de causalidad no se puede establecer a base de una mera especulación o conjetura.

*López v. Doctor Cañizares*, 163 DPR, a las págs. 134-135. (Citas suprimidas).

Valga destacar que en esta jurisdicción rige la doctrina de causalidad adecuada, la cual postula que no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general. *Santiago v. Sup. Grande*, 166 DPR 796, 818-819 (2006). Por tanto, para determinar cuál fue la causa del daño, el demandante tiene que probar que la omisión del demandado fue la que con mayor probabilidad ocasionó el perjuicio reclamado. *Íd.*, a la pág. 819.

B

La Regla 702 de Evidencia, 32 LPRA Ap. VI, establece lo relativo al testimonio pericial. En específico, dispone que, "cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia, una persona testigo capacitada como perita - conforme a la Regla 703 - podrá testificar en forma de opiniones o de otra manera".

Es decir, es suficiente con que el testigo tenga el conocimiento, destreza, experiencia, entrenamiento o educación formal, en relación con la materia o el asunto sobre el cual habrá de prestar testimonio, de modo

que este sea de ayuda al juzgador. Regla 703(A) de Evidencia, 32 LPRA Ap. VI. Por tanto, el conocimiento del perito, en el contexto de la solución de controversias jurídicas, constituye "uno de los medios de prueba personales auxiliadores al desempeño judicial". *San Lorenzo Trad., Inc. v. Hernández*, 114 DPR 704, 709 (1983).

El Tribunal Supremo de Puerto Rico ha reconocido tres categorías de peritos:

> (1) **peritos de ocurrencia**, que son "aquellos que de antemano han obtenido conocimiento extrajudicial de los hechos a través de observaciones directas o por participación en eventos subsiguientemente pertinentes a la litigación"; (2) **peritos en general**, que son "los que no están relacionados con los hechos singulares en controversia", y (3) **peritos intermedios**, que "[c]omprende a quienes, debido a los estudios específicos que han efectuado en previsión del futuro o durante el proceso, están familiarizados con los hechos particulares del caso".

*Boitel Santana v. Cruz*, 129 DPR 725, 731 (1992). (Énfasis nuestro).

En lo pertinente, el perito de ocurrencia es aquel que tiene conocimiento de los hechos por haberlos percibido, por lo que posee información irremplazable. *Íd.*, a la pág. 732. De hecho, el perito de ocurrencia es considerado un testigo ordinario, sin embargo, se distingue de este último en que utiliza su entrenamiento especial al percibir los sucesos. *Íd.*

Por otra parte, el valor probatorio del testimonio pericial depende de varios factores, entre ellos:

> (a) si el testimonio está basado en hechos o información suficiente;
> (b) si el testimonio es el producto de principios y métodos confiables;
> (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;
> (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;
> (e) las calificaciones o credenciales de la persona testigo; y
> (f) la parcialidad de la persona testigo.

Regla 702 de Evidencia, 32 LPRA Ap. VI.

Consecuentemente, la especialización de un perito en un área determinada es decisiva en lo que respecta al valor probatorio que el juzgador de los hechos le adjudicará a su testimonio. Por tanto, la falta de

especialidad incide sobre la valoración de la prueba, mas no en la cualificación de un testigo como perito. *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.*, 150 DPR 658, 664 (2000).

Por otra parte, el juzgador no está obligado a aceptar las conclusiones de un perito, si luego de evaluar su testimonio concluye que no merece credibilidad, por lo que tendrá la facultad de rechazarlo. *S.L.G. Font Bardón v. Mini-Warehouse*, 179 DPR 322, 346 (2010). Además, sobre la evaluación y suficiencia de la prueba, la evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley. Regla 110(d) de Evidencia, 32 LPRA Ap. VI.

C

La Regla 42.2 de Procedimiento Civil dispone que: [...] Las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos. [...]. 32 LPRA Ap. V.

Cónsono con ello, es norma reiterada que, en ausencia de pasión, perjuicio, parcialidad o error manifiesto, los tribunales apelativos no debemos intervenir con la apreciación de la prueba de los tribunales de primera instancia. *Rodríguez v. Urban Brands*, 167 DPR 509, 522 (2006). Al definir lo que constituye pasión, perjuicio o parcialidad, el Tribunal Supremo ha expresado que:

> Incurre en "pasión, prejuicio o parcialidad" aquel juzgador que actúe movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna.

*Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 782 (2013).

La deferencia hacia el foro primario responde a que es el juez sentenciador el que tiene la oportunidad de recibir y apreciar toda la prueba testifical presentada, de escuchar la declaración de los testigos y evaluar

su comportamiento. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67 (2009).

No obstante, es pertinente señalar que la doctrina de deferencia judicial no es de carácter absoluto; se puede intervenir "cuando la apreciación de la prueba no representare el balance más racional, justiciero y jurídico de la totalidad de la prueba". *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011). Asimismo, nuestra intervención procede cuando, luego de hacer un análisis integral de la prueba testifical, su evaluación nos haya causado una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido de justicia. *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012).

Además, se exceptúan de la regla de deferencia las determinaciones de hechos que se apoyan exclusivamente en prueba documental o pericial, ya que los tribunales apelativos estamos en idéntica posición que el tribunal inferior al examinar ese tipo de prueba. *González Hernández v. González Hernández*, 181 DPR, a la pág. 777.

D

Según el Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, según enmendada, el contrato de seguros es aquel "mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo". 26 LPRA sec. 102. Así, nuestro Tribunal Supremo estableció firmemente que la relación jurídica entre una aseguradora y su asegurado es de naturaleza contractual, la cual se rige particularmente por lo pactado en el contrato de seguros, que es ley entre las partes. *Integrand Asurance v. CODECO, et al.*, 185 DPR 146, 161 (2017); *Gen. Accid. Ins. Co. P.R. v. Ramos*, 148 DPR 523, 531 (1999).

Por su parte, sabido es que la regla que impera en materia de derecho civil es que la solidaridad no se presume. El Art. 1090 del Código Civil, 31 LPRA sec. 3101, dispone que la concurrencia de dos o más deudores en una sola obligación no implica que cada uno de estos deba

prestar íntegramente las cosas objeto de dicha obligación[23]. Además, el precitado artículo establece la mancomunidad como la regla, y la solidaridad como la excepción, y surge esta última solo cuando la obligación expresamente lo determine. *Fraguada Bonilla v. Hosp. Aux. Mutuo*, 186 DPR 365, 375 (2012).

Por lo tanto, en el ámbito contractual, debido a la oportunidad que tienen las partes para determinar el alcance de su relación, el Art. 1090 del Código Civil provee para que los contratantes pacten expresamente la solidaridad. *Maldonado Rivera v. Suárez y otros*, 195 DPR 182, 195 (2016). Una vez pactada la solidaridad, las partes contratantes se obligan a todos los extremos de lo pactado; ello, conforme al principio rector de *pacta sunt servanda*, y, claro está, siempre que lo pactado sea conforme a la ley, la moral y el orden público. *C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 451 (2009).

En particular, el Tribunal Supremo interpretó el Art. 1090, sobre la relación contractual entre una aseguradora y su asegurado, y resolvió que "[p]ara que exista solidaridad entre una compañía aseguradora y el asegurado, ello **debe surgir claramente del contrato de seguros**. Dicha solidaridad debe haberse pactado expresamente o, al menos, debe surgir claramente del contenido del contrato que la relación entre las partes se constituyó con tal carácter". *Gen. Accid. Ins. Co. P.R. v. Ramos*, 148 DPR, a la pág. 537. (Énfasis nuestro).

III

Los apelantes señalan, en conjunto, un total de trece (13) errores que se resumen en que el Tribunal de Primera Instancia erró en su evaluación de la totalidad prueba testimonial, documental y pericial al determinar que ambos médicos apelantes fueron negligentes en el tratamiento y manejo de la paciente, y que se apartaron de la mejor práctica de la medicina durante sus respectivas intervenciones.

---

[23] *Véase*, además, la nota al calce núm. 22, *ante*.

Además, sostienen que el tribunal incidió al otorgarle mayor peso probatorio a la prueba pericial de la parte apelada, sin considerar la prueba pericial presentada por ellos, la cual contaba con mejores cualificaciones. Finalmente, alegan que el foro primario erró al imponer responsabilidad solidaria entre los médicos apelantes y su aseguradora, pues en su contrato de seguros no se pactó la solidaridad.

A

Sobre los asuntos relacionados a la cualificación de los peritos, ambos médicos apelantes aducen que el foro apelado erró al adjudicarle credibilidad al perito de la parte apelada, el doctor Miranda Aponte, pues este presuntamente contaba con credenciales de estudios y especialidad inferiores a las de los peritos presentados por ellos. Ante esto, sostienen que el tribunal descartó los informes periciales de sus respectivos peritos, emergenciólogos acreditados, al momento de hacer las determinaciones vertidas en el dictamen apelado. Arguyen, a su vez, que el foro primario adoptó su opinión sin justificación, a pesar de que el doctor Miranda Aponte no sustentó su criterio en la objetividad del expediente médico, ni en alguna literatura médica reconocida o en su experiencia clínica contemporánea.

Por otro lado, los apelados arguyen que su perito cuenta con una especialidad que le fue otorgada a base de su vasta experiencia trabajando en salas de emergencias, por lo que el tribunal lo cualificó como perito correctamente. Sostienen que el foro primario contaba con amplia discreción para adoptar su criterio al sopesar la prueba pericial desfilada. Alegan que el Tribunal de Primera Instancia no incidió en su apreciación de la prueba pericial, pues igualmente evaluó el testimonio de los peritos de la parte apelante, el cual corroboraba las presuntas desviaciones médicas señaladas por su perito.

Cónsono con los principios antes expuestos, le asiste la razón a la parte apelada en cuanto a que el Tribunal de Primera Instancia estaba facultado para cualificar al perito de la parte apelada y para aceptar

discrecionalmente sus conclusiones según la credibilidad que le haya merecido.

Este Tribunal reconoce que las cualificaciones del perito de los apelados contrastan con aquellas de los peritos de los apelantes. En este caso, el doctor Miranda Aponte es un médico generalista retirado, que fue presuntamente titulado como emergenciólogo mediante un *grandfather clause* por las horas trabajadas en salas de emergencias, mientras que los doctores Gómez Marcial y Nieves Cabán son médicos emergenciólogos graduados de una residencia de medicina en sala de emergencia. Ciertamente, tales cualificaciones no descalificaban al primero como perito, pero sí incidían en el valor probatorio de su testimonio[24].

Además, surge que el doctor Miranda Aponte, contrario al doctor Gómez Marcial y la doctora Nieves Cabán, no incluyó ni consideró literatura médica para sustentar su opinión sobre controversias medulares al presente caso, tales como el momento en que debía comenzarse la transfusión de sangre, o que demostraran contundentemente que la paciente no debía sedarse ante el cambio sensorial exhibido. Es decir, su testimonio se limitó a conclusiones claramente subjetivas, presuntamente basadas en su experiencia. No obstante, la única determinación incluida en el dictamen apelado con relación a la evaluación de la prueba pericial de la parte apelada va dirigida precisamente a estos asuntos.

En contraste, no surge que el foro apelado hubiera ponderado los testimonios o los informes de ambos peritos de los apelantes, los cuales sometieron literatura médica objetiva y reconocida sobre estos asuntos, y que, además, no pudo refutarse por el perito de los apelados. A tenor con lo expuesto, somos del criterio de que el foro primario incidió al adjudicarle mayor valor probatorio a las opiniones del doctor Miranda Aponte, pues los peritos de la parte apelante se encontraban en mejor posición que el perito del demandante respecto al valor probatorio de su opinión.

---

[24] *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.,* 150 DPR 658, 664 (2000).

B

Somos plenamente conscientes de la naturaleza y extensión de nuestra facultad revisora, que exigen que, en ausencia de error manifiesto, pasión, prejuicio o parcialidad, nos abstengamos de intervenir con las determinaciones de hechos y la adjudicación de credibilidad hecha por el juzgador de hechos en el Tribunal de Primera Instancia. Además, que tales determinaciones de hechos merecen gran deferencia y no deben ser descartadas arbitrariamente ni sustituidas por nuestro criterio.

Sin embargo, en casos como el que nos ocupa, nos vemos compelidos a intervenir cuando el análisis integral de la prueba nos causa una intranquilidad de tal magnitud que estremece nuestro sentido de justicia, o cuando su apreciación no representa el balance más racional, justiciero y jurídico. Como mencionamos al comienzo de esta *Sentencia*, contamos con el beneficio de la transcripción de la prueba oral, así como toda la prueba documental y pericial desfilada ante el foro primario, por lo cual nos encontramos en idéntica posición para examinar la misma.

Tomando esto en consideración, procederemos a revisar si, a base de la totalidad de la prueba, se demostró que los doctores apelantes fueron negligentes en sus respectivas intervenciones con doña Tomasa y si, en efecto, se apartaron de la mejor práctica de la medicina.

i

En primer orden, el doctor Colón Bermúdez arguye que el Tribunal de Primera Instancia incidió en su apreciación de la prueba desfilada ante sí para concluir que él se desvió de los estándares de la práctica de la medicina. Aduce que el foro primario incidió al determinar que el fallecimiento de la paciente era atribuible a él, sin tan siquiera analizar la prueba pericial que el propio apelante presentó. Además, el doctor Colón Bermúdez alude a que, en la sentencia objeto de revisión, el foro primario impuso su criterio sin tomar en consideración la objetividad de lo que refleja el expediente médico en cuanto a su intervención con la paciente.

Adicionalmente, el doctor apelante alega que la controversia principal relacionada a su intervención gira alrededor del momento en que doña Tomasa debía comenzar a transfundirse. En particular, el galeno arguye que ordenó la transfusión de sangre de manera oportuna y conforme a la mejor práctica de la medicina. A tales efectos, sostiene que la orden se emitió cuando la hemoglobina de la paciente descendió al nivel que la única literatura médica sometida acepta como criterio para iniciar la transfusión.

Por su parte, los apelados sostienen que su prueba fue corroborada por la prueba sometida por el propio apelante, de manera que el foro primario no erró en su apreciación para determinar la negligencia imputada al doctor Colón Bermúdez. Arguye que el doctor Colón Bermúdez se desvió del estándar de cuidado médico debido a que el galeno no fue diligente en la supervisión de la ejecución de sus órdenes, ni en el monitoreo adecuado de la paciente. En cuanto a la controversia sobre la orden de transfusión de sangre, estos afirman que esta era de carácter urgente y necesaria conforme a los criterios de la literatura médica, y aunque fue impartida de manera tardía, el doctor apelante no procuró su cumplimiento inmediato.

Con el fin de analizar las sendas argumentaciones de las partes comparecientes, examinamos cómo se desarrollaron los hechos, que culminaron en el fallecimiento de doña Tomasa.

La intervención del doctor Colón Bermúdez comenzó la noche del 18 de junio de 2018, cuando doña Tomasa llegó a la sala de emergencias del MMC, a eso de las 9:10 pm[25], luego de haber sido trasladada del Centro de Salud de Añasco (CDT Añasco) con un diagnóstico inicial de hematemesis[26]. La paciente trajo del CDT Añasco los resultados de un

---

[25] *Véase*, apéndice del recurso KLAN202500515, a la pág. 87.

[26] *Íd.*, a la pág. 342. Conforme al *Diccionario Panhispánico de Términos Médicos* de la Real Academia Nacional de Medicina de España, la **hematemesis** es el vómito que contiene sangre, que puede proceder de una hemorragia gástrica o duodenal, o también haber sido deglutida desde tramos superiores. *Véase*, página electrónica del diccionario en www.dtme.ranm.es.

*CBC*[27], el cual reflejó, entre otras cosas, que su nivel de hemoglobina se encontraba en 9.2 g/dL en ese momento[28].

A las 9:23 pm, se realizó el *triage* a la paciente y se documentó la queja principal como dolor abdominal y vómitos con sangre[29]. A las 10:25 pm, la paciente fue evaluada por el doctor Colón Bermúdez, quien luego de hacer varios exámenes físicos, documentó una impresión diagnóstica de hemorragia gastrointestinal aguda[30]. Ante este cuadro, entre las 10:38 pm y las 10:56 pm, el doctor Colón Bermúdez redactó varias órdenes médicas, entre las cuales incluyó realizar pruebas de laboratorio adicionales como otro *CBC* y un estudio de histocompatibilidad sanguínea o *type and screen*, de manera *STAT*[31].

Además, el galeno ordenó que se le colocara una sonda *Foley*, una cánula de oxígeno y la infusión de solución normal salina a mil mililitros (1,000 ml) por hora, reduciendo el volumen de infusión a cien mililitros (100 ml) por hora luego de la primera hora[32]. Surge del expediente médico que el resultado del CBC fue liberado a las 11:30 pm, y este reflejó que, en ese momento, la paciente tenía su hemoglobina en 7.1 g/dL[33].

Posteriormente, a eso de las 12:28 am del 19 de junio de 2018, una de las enfermeras del MMC redactó una nota de progreso en la que documentó que la paciente en ese momento se encontraba alerta, sin problemas de comunicación, calmada y cooperadora[34]. Además, documentó que a la paciente se le colocó la sonda *Foley* y que se tomó la muestra de sangre para *type and screen*, según las órdenes del doctor

---

[27] CBC o *complete blood count*, se refiere a la prueba de laboratorio de sangre.

[28] *Véase*, apéndice del recurso KLAN202500515*,* a la pág. 341.

[29] *Íd.*, a la pág. 87.

[30] *Íd.,* a la pág. 341.

[31] *Íd.*, a las págs. 357, 374-375.

[32] *Íd.* STAT, del latín *statim* o inmediatamente.

[33] *Íd.*, a la pág. 351. Aunque las partes estipularon que los resultados de este estudio fueron liberados a las 10:41 pm, un examen detallado del expediente médico nos muestra que realmente fueron reportados a la hora señalada.

[34] *Véase*, apéndice del recurso KLAN202500515*,* a la pág. 88.

Colón Bermúdez[35]. Los resultados de este último estudio fueron reportados por el Banco de Sangre del MMC a las 2:07 am[36]. Sin embargo, surge del expediente médico que la orden de colocación del *Foley* fue ejecutada a las 5:25 am, por un enfermero de apellido Nazario[37].

Tras varias horas de inactividad, el doctor Colón Bermúdez reevaluó a doña Tomasa a eso de las 5:04 am[38]. El galeno puso en el sistema una orden para que se consultara con el internista de la paciente, el doctor Colón Padilla[39]. Adicionalmente, a las 5:25 am, ordenó la realización de otro estudio de CBC. Los resultados de este último estudio fueron liberados a las 6:47 am, y reflejaron que la paciente, a ese momento, tenía su hemoglobina en un valor crítico de 6.5 g/dL[40]. Este valor de hemoglobina fue notificado personalmente al doctor Colón Bermúdez por el tecnólogo de laboratorio a las 6:52 am[41].

Por esto, el galeno ordenó de manera *STAT* cuatro (4) unidades de glóbulos rojos empacados para comenzar la transfusión de la paciente entre 6:47 am y 6:51 am[42]. A pesar de la naturaleza de la orden, no fue sino hasta las 7:25 am que la enfermera de apellido Durán llamó al laboratorio para confirmar la disponibilidad de sangre[43]. Durante dicha llamada, la tecnóloga del laboratorio informó que debía repetirse el *type and screen* para confirmar y preparar las unidades; orden que fue ejecutada por la enfermera de apellido Mangual[44].

---

[35] *Véase*, apéndice del recurso KLAN202500515, a las págs. 364-365.

[36] *Íd.* a la pág. 384.

[37] *Íd.*, a la pág. 369.

[38] *Íd.*, a las págs. 346-348.

[39] *Íd.*, a la pág. 357.

[40] *Íd.*

[41] *Íd.*, a la pág. 354.

[42] *Íd.*, a la pág. 88.

[43] *Íd.*, a la pág. 373.

[44] *Íd.*

En ese momento, la enfermera observó que la paciente estaba pálida y que la familiar que la acompañaba se encontraba exigente y demandante[45]. Luego de esta intervención, a la paciente se le realizó otro CBC, cuyos resultados confirmaron que, a eso de las 7:39 am, la paciente continuaba con un nivel crítico de hemoglobina[46].

A eso de las 8:00 am del 19 de julio de 2019, el doctor Colón Bermúdez culminó su turno en la sala de emergencias del MMC, y fue relevado por la doctora Vázquez Latoni[47]. En ese momento, surge que doña Tomasa tenía una orden pendiente de transfusión de sangre, y que se había colocado una consulta al médico internista de la paciente[48].

Del derecho consignado queda meridianamente claro que, en una acción por daños y perjuicios por actos de impericia médica, se requiere que el demandante logre establecer ante el juzgador de los hechos que el daño emergente fue causado por los actos de negligencia, falta de cuidado o impericia del médico demandado. Además, deberá probarse, mediante prueba pericial, aquellas normas mínimas de conocimiento y cuidado médico, y cómo el médico demandado se apartó de las mismas, causando así el daño alegado.

En este caso, el Tribunal de Primera Instancia determinó que la prueba pericial de los apelados había establecido que, ante el sangrado interno de la paciente, era necesario que se estabilizara mediante transfusiones de sangre oportunas y consultas a especialistas. A estos efectos, el foro primario determinó que el doctor Colón Bermúdez falló al no ordenar la transfusión de sangre tan pronto la paciente llegó a la sala de emergencias del MMC, y al no procurar una consulta para realizar una endoscopía de emergencia.

---

[45] *Véase*, apéndice del recurso KLAN202500515, a la pág. 373.

[46] *Íd.,* a la pág. 355.

[47] *Íd.*, a la pág. 89.

[48] *Íd.*, a la pág. 349.

Adicionalmente, el foro apelado determinó que el doctor Colón Bermúdez fue negligente porque no tomó acciones oportunas para estabilizar a la paciente, no veló que sus órdenes se cumplieran, no anticipó las complicaciones reconocidas en la literatura médica e incluso que se ignorasen múltiples notificaciones de valores pánico que requerían atención inmediata.

De los autos ante nuestra consideración surge que la prueba pericial de los apelados reitera sus argumentos en cuanto a que la mejor práctica de la medicina en pacientes con sangrado gastrointestinal requería que se tratara a la paciente de manera agresiva, con oxígeno y líquidos para estabilizarla, y que se le colocara una sonda *Foley* para medir el egreso e ingreso urinario con el fin de corroborar la efectividad de dicho tratamiento[49]. Además, el perito de los apelados planteó que debía haberse acelerado la disponibilidad de sangre a su llegada a la sala de emergencias del MMC[50], haberse puesto una consulta con especialistas que pudiesen identificar y corregir la causa del sangrado[51], y ordenarse un monitoreo seriado de signos vitales[52].

No obstante, no podemos obviar que, a minutos de su evaluación inicial, el doctor Colón Bermúdez emitió una serie de órdenes que incluían la mayoría de las sugerencias del perito de los apelados. Inclusive, los peritos de ambas partes coincidieron en que la intervención inicial del galeno fue apropiada y asertiva[53]. Por otro lado, el doctor Gómez Marcial, perito del doctor Colón Bermúdez, refutó, también, la agresividad de la resucitación mediante líquidos intravenosos, pues esta medida puede

---

[49] *Véase*, TPO de 4 de abril de 2024, a la pág. 173. *Véase*, además, apéndice del recurso KLAN202500515, a la págs. 199, 200 y 203.

[50] *Véase*, TPO de 25 de marzo de 2024, a la pág. 234.

[51] *Íd.*, a la pág. 221.

[52] *Íd.,* a la pág. 205.

[53] *Véase*, TPO de 4 de abril de 2024, a la pág. 37 y 153; TPO de 27 de junio de 2024, a las págs. 223-224, 226.

conllevar un riesgo de complicaciones en pacientes con problemas pulmonares o circulatorios, como lo era doña Tomasa[54].

Sin embargo, el propio perito del doctor apelante admitió que dicha intervención careció de una orden de consulta a un gastroenterólogo, pues la efectividad del tratamiento quedaba comprometida si no se trataba previamente la causa del sangrado proveniente de las úlceras estomacales que tenía la paciente[55]. Sobre esto, dicho perito reconoció que, ante la falta de este especialista en el MMC, lo ideal hubiese sido un traslado a otra institución[56]. Aún más determinante, el doctor Gómez Marcial testificó que, ante pacientes que presentan algún tipo de sangrado, es necesario ordenar la evaluación constante de sus signos vitales, junto a un monitoreo seriado o frecuente de la hemoglobina[57]. Dicho perito admitió que no halló orden alguna por parte del doctor Colón Bermúdez a estos efectos[58]. A igual conclusión llega este Tribunal.

Ahora bien, aunque el doctor apelante expone reiterada y correctamente que la paciente se encontraba alerta durante la totalidad de su intervención y que nunca vomitó sangre durante su estadía en la sala de emergencias, lo cierto es que el expediente médico refleja que ella ya exhibía un descenso sustancial de hemoglobina a su llegada al MMC, y que había una posibilidad de que se tratase de un sangrado interno. Sumémosle a esto el hecho de que el propio galeno tuvo una impresión inicial de sangrado gastrointestinal. Además, la literatura médica sometida por el doctor Gómez Marcial también estableció que, en pacientes con taquicardia e hipotensión, como la paciente en este caso, puede presumirse que esta padecía de una hemorragia severa[59].

---

[54] *Véase,* TPO de 27 de junio de 2024, a la pág. 227.

[55] *Íd.*, a las págs. 260-261, 265.

[56] *Íd.*, a las págs. 399-400

[57] *Íd.*, a las págs. 291-292.

[58] *Íd.*

[59] *Íd.*, a las págs. 298-299.

Asimismo, el perito de los apelados testificó que este tipo de pacientes requiere de monitoreo de signos vitales periódicos; hecho que fue confirmado por el propio perito del apelante. Sin embargo, no surge del récord médico que el doctor Colón Bermúdez hubiera emitido una orden a estos efectos. De hecho, **el propio expediente médico nos muestra que ni el doctor Colón Bermúdez ni el personal de enfermería tuvieron intervención alguna con la paciente entre las 12:42 am y las 5:06 am del 19 de junio de 2018**. La ausencia de una orden tan fundamental nos mueve a coincidir con el foro primario en cuanto a su evaluación de toda la prueba pericial para determinar la negligencia imputada sobre estos aspectos.

Ahora bien, en cuanto al momento en que debía iniciarse la transfusión, los argumentos del doctor apelante nos convencen. Según discutido, el perito de la parte apelada se limitó a señalar que la paciente debía transfundirse de manera inmediata a su llegada al MMC[60]. Un análisis detenido de la prueba desfilada demuestra que tal aseveración no se encuentra sostenida en literatura médica alguna, sino que emana de su propio criterio personal. Por otro lado, la parte apelante sometió la única fuente de literatura médica a estos efectos, la cual indicaba que las transfusiones de sangre se ordenan conforme a unos parámetros establecidos previo a iniciar el proceso, de manera que se eviten otro tipo de complicaciones.

La literatura citada, confirmada por el testimonio pericial[61], establece que un médico puede ordenar la transfusión cuando el nivel de la hemoglobina del paciente sea menor a valores desde 7.0 g/dL hasta 8.0 g/dL[62]. Es decir, según dicha literatura, el médico tiene un margen para ejercer su criterio en cuanto al momento en que debe ordenarse la transfusión, siempre que la hemoglobina descienda a un valor menor a los

---

[60] *Véase*, TPO de 26 de marzo de 2024, a la pág. 119.

[61] *Véase*, TPO de 4 de abril de 2024, a la pág. 216; y TPO de 1 de julio de 2024, a la pág. 141.

[62] *Véase*, apéndice del recurso KLAN202500515, a las págs. 262-264.

contenidos en el rango señalado. Como podemos ver, a base de su criterio médico, el doctor Colón Bermúdez ordenó la transfusión de manera inmediata tan pronto le fue informado el descenso de la hemoglobina de la paciente a un valor crítico de 6.6 g/dL. En ese sentido, no podemos sino concluir que el doctor Colón Bermúdez fue oportuno en ordenar la transfusión conforme a los estándares médicos, tan pronto advino en conocimiento de un valor menor al rango antes mencionado.

En conclusión, lo expresado en la literatura médica sometida y el testimonio pericial apoya la contención del doctor Colón Bermúdez en cuanto a sus órdenes iniciales y al tratamiento de transfusión de sangre. Sin embargo, la totalidad de los testimonios periciales apoyan el hecho de que, de haberse detectado oportunamente el descenso en los niveles de hemoglobina, o de haberse trasladado a una institución con disponibilidad de médicos especialistas, hubiese aumentado la probabilidad de la efectividad del tratamiento ofrecido a doña Tomasa. No hallamos criterio alguno que apoye el hecho de que la paciente haya sido desatendida sin ser monitoreada o evaluada por un espacio de aproximadamente cinco (5) horas; máxime cuando contaba con una impresión diagnóstica de sangrado gastrointestinal agudo.

Empero, la negligencia del doctor Colón Bermúdez emana principalmente de la falta de monitoreo seriado de los signos vitales y de los niveles de hemoglobina de la paciente, lo cual no solo era necesario para evaluar la efectividad del tratamiento, sino que era primordial para detectar oportunamente los descensos en sus niveles de hemoglobina. Sobre esto, el foro primario no erró en su evaluación de la totalidad de la prueba para determinar que la falta de estas órdenes médicas por parte del doctor apelante no se conforma a las mejores prácticas de la medicina.

ii

En segundo orden, la doctora Vázquez Latoni alega que el Tribunal de Primera Instancia erró al imputarle responsabilidad por impericia médica sin hacer un análisis ponderado de toda la prueba pericial desfilada, la cual

presuntamente acredita que su actuación cumplió con los estándares de cuidado médico en sala de emergencias. Plantea, además, que el foro apelado incidió al no considerar en sus determinaciones la condición clínica de la paciente y la secuencia de manejo previo al inicio de su turno.

Sobre esto, sostiene que su presunta omisión no fue la causa próxima de la muerte de la paciente, pues la condición de esta se encontraba deteriorada de manera irreversible e irreparable por causa del manejo brindado por el personal de enfermería previo a su intervención. Por lo tanto, aduce que su intervención se limitó a breves minutos durante los cuales proveyó un tratamiento adecuado, y durante los cuales no hubiese podido cambiar el desenlace de la condición de la paciente. Añade la doctora apelante que el foro primario erró al imputarle negligencia por la orden de sedación y de un *CT Scan*[63] craneal emitida por esta, sin evaluar la razonabilidad clínica de los diagnósticos diferenciales.

Por otro lado, la parte apelada alega que el Tribunal de Primera Instancia no erró al concluir que la presunta omisión de la doctora fue causa próxima y determinante del fallecimiento, pues postula que su omisión de no revisar el expediente a su llegada la llevó a desatender las órdenes pendientes. Arguye que la falta de gestiones sobre tales órdenes constituye una desviación de los estándares de cuidado, que contribuyó al desenlace fatal de la paciente. Además, sostiene que procede la imputación de negligencia debido a que la doctora apelante ordenó la sedación de la paciente y un *CT Scan* craneal ante el cambio súbito de estado mental de la paciente, en vez de investigar su causa y corregirla.

En cuanto a la intervención de la doctora Vázquez Latoni, surge de la prueba desfilada que la doctora apelante entró a su turno en la sala de emergencias del MMC a las 8:00 am del 19 de junio de 2018[64]. Durante la entrega de turno, el doctor Colón Bermúdez informó a la doctora Vázquez Latoni, verbalmente, el cuadro clínico que presentaba doña Tomasa. Así,

---

[63] Se refiere a una tomografía computarizada.

[64] *Véase*, apéndice del recurso KLAN202500515, a la pág. 89.

el primero le informó que la paciente tenía un valor crítico de hemoglobina, pero que ya contaba con una orden para iniciar la transfusión de sangre, y que había colocado una consulta con su internista, el doctor Colón Padilla[65].

Mientras esto sucedía, el personal de enfermería se encontraba tramitando con el laboratorio la disponibilidad de la sangre a transfundirse[66]. Además, un tecnólogo médico se comunicó con el enfermero de apellido Mejías a eso de las 8:10 am para informar que la paciente se encontraba con un nivel de hemoglobina de 6.6 g/dL[67]. Sin embargo, no se desprende que este dato fuese remitido a la doctora apelante.

A eso de las 9:00 am, enfermería documentó que se había provisto un baño en cama a la paciente, y que se le había tomado una muestra de sangre oculta en heces, la cual se encontraba pendiente de ejecución[68]. Así las cosas, a eso de las 9:48 am, una de las enfermeras le tomó los signos vitales a doña Tomasa, y documentó que esta se encontraba algo desorientada y agresiva[69]. No obstante, y sin alertar a la doctora Vázquez Latoni del cambio de sensorio, el personal comenzó la transfusión de sangre a las 10:10 am[70].

A los pocos minutos, la paciente se tornó agresiva y se descanalizó la línea de transfusión, situación que el personal de enfermería le informó a la doctora apelante[71]. Ante este cuadro, la galena ordenó que se le administraran dos miligramos (2 mg) de *Ativan*[72] para calmar a la paciente,

---

[65] *Véase*, apéndice del recurso KLAN202500515, a la pág. 349. *Véase*, además, TPO de 28 de junio de 2024, a la pág. 21.

[66] *Véase*, apéndice del recurso KLAN202500515, a las págs. 372-373.

[67] *Íd.*, a la pág. 88.

[68] *Íd.*, a la pág. 372.

[69] *Íd.*, a la pág. 373.

[70] *Íd.*, a la pág. 372.

[71] *Íd.*, a la pág. 373.

[72] Marca comercial del medicamento *Lorazepam*, que se utiliza mayormente para tratar la ansiedad.

luego de lo cual se pudo canalizar nuevamente a la paciente y así continuar con la transfusión[73]. Además, añadió una orden para realizar un *CT Scan* craneal[74].

A las 10:35 am, la enfermera de apellido Mangual se encontraba en una ronda de cambio de pañal, y se percató de que doña Tomasa no mostraba signos vitales y que presentaba, además, sangrado por su boca y sus oídos[75]. Ante esto, la enfermera procedió a alertar a la doctora Vázquez Latoni[76], quien detuvo la transfusión y comenzó las medidas de resucitación. Tales medidas incluyeron la entubación endotraqueal y la administración de epinefrina, junto a mil miligramos (1,000 mg) de solución normal salina y el antídoto del *Ativan*[77]. Sin embargo, tales esfuerzos de resucitación resultaron infructuosos, certificándose la muerte de la paciente a las 11:09 am[78].

Cual citado, a los médicos les cobija una presunción de corrección en cuanto al cuidado y tratamiento brindado. Consecuentemente, para prevalecer en una acción por impericia médica, el demandante tiene la obligación de derrotar dicha presunción al demostrar que el demandado fue negligente, y que tal conducta fue la causa más probable de los daños reclamados. No obstante, la presunción aludida no es rebatible por la mera posibilidad de que el daño se deba al incumplimiento de la obligación personal del médico demandado.

De la sentencia objeto de revisión en este recurso se desprende que la negligencia de la doctora Vázquez Latoni fue imputada a raíz de su presunta omisión de revisar el expediente médico de doña Tomasa tan pronto entró a su turno. El foro primario determinó que la doctora Vázquez Latoni fue negligente por no haber examinado el expediente médico desde

---

[73] *Véase*, apéndice del recurso KLAN202500515, a las págs. 349 y 373.

[74] *Íd.*

[75] *Íd.*, a la pág. 89.

[76] *Íd.*

[77] *Íd.*

[78] *Íd.*, a la pág. 373.

que asumió la responsabilidad de la sala de emergencias, ignorando por horas a una paciente que requería atención médica inmediata. Además, el foro apelado determinó que la doctora Vázquez Latoni tampoco se percató oportunamente sobre la hipoxemia por falta de sangre que causó el cambio de sensorio en la paciente, por lo que la doctora apelante desatendió el desangramiento que presentaba doña Tomasa.

Tales determinaciones parecen estar cimentadas en las contenciones de los apelados, quienes reiteradamente se limitaron a exponer ante el foro primario que la mejor práctica de la medicina requería que la doctora Vázquez Latoni revisara el expediente médico en su totalidad tan pronto le fue entregado el turno por el doctor Colón Bermúdez, de manera que corrigiera el manejo brindado previo a su intervención. En cuanto al asunto de la sedación, la prueba de los apelados se circunscribió a señalar que la conducta de la paciente respondió a la falta de oxígeno y perfusión sanguínea del cerebro, y que la doctora apelante falló en las órdenes que emitió ante tal situación. Sin embargo, no presentaron prueba adicional a las aseveraciones de su perito.

A tales efectos, el doctor Miranda Aponte planteó que la entrega entre médicos de sala de emergencias requiere que estos vayan por cada paciente a discutir su cuadro clínico, seguido de una entrega de lo discutido que a veces se hace por escrito, aunque no hay literatura que exija un método específico[79]. Testificó, además, que el médico entrante tiene la responsabilidad de revisar el expediente en toda su extensión para revisar qué órdenes quedan pendientes[80]. De esta manera, este perito se limitó a afirmar que la intervención de la doctora Vázquez Latoni fue inapropiada porque no revisó el expediente de la paciente, de manera que pudiera corregir el manejo previo a su turno[81].

---

[79] *Véase*, TPO de 26 de marzo de 2024, a la pág. 58; y TPO de 4 de abril de 2024, a la pág. 95.

[80] *Véase*, TPO de 26 de marzo de 2024, a la pág. 58.

[81] *Íd.*, a las págs. 61, 64-65.

En cuanto a la controversia sobre la orden de sedación, el doctor Miranda Aponte testificó que la administración de *Ativan* era improcedente, pues lo correcto era averiguar la causa del cambio en conducta de la paciente, y no sedarla[82]. Añadió que la orden del *CT Scan* se apartó de la mejor práctica de la medicina, pues aseveró que era evidente que el cambio de sensorio respondía a la hipoxemia, pues la paciente no presentaba patología alguna en el cerebro desde su llegada al MMC[83].

Por su parte, la perita de la doctora Vázquez Latoni, la doctora Nieves Cabán, expuso ante el foro primario que la transición de médicos en sala de emergencias requiere que se informe el historial del paciente, su opinión y el plan de tratamiento y órdenes emitidas, de manera que el médico entrante tenga conocimiento[84]. Esta testificó que tal transición puede hacerse de forma escrita o verbal[85]. A base de esto, la perita afirmó que, en el caso de doña Tomasa, hubo una transición del doctor Colón Bermúdez hacia la doctora Vázquez Latoni, pues ya la paciente estaba recibiendo tratamiento médico, se habían realizado múltiples pruebas de laboratorio, y se había puesto una consulta[86].

En cuanto a la administración del sedante, la doctora Nieves Cabán testificó que tal orden se ajustó a las normas de cuidado médico razonable, pues respondió a un esfuerzo de tranquilizar a la paciente con el fin de que el personal de enfermería pudiese recanalizar sus venas para continuar con el proceso de transfusión[87]. Para sustentar su postura, sometió con su informe pericial literatura médica que apoyaba su contención en cuanto a que la administración de sedantes no ocasiona cambios clínicamente significativos[88].

---

[82] *Véase*, TPO de 26 de marzo de 2024, a la pág. 90.

[83] *Íd.,* a la pág. 91.

[84] *Véase*, TPO de 1 de julio de 2024, a la pág. 47.

[85] *Íd.*, a las págs. 47-48.

[86] *Íd.*, a la pág. 48.

[87] *Íd.*, a las págs. 51-52.

[88] *Véase*, apéndice del recurso KLAN202500515, a las págs. 332-333.

Examinados la prueba desfilada en juicio, así como los informes preparados por el perito de la parte apelada y por la perita de la doctora apelante, nos persuade el argumento de esta última cuando asevera que los apelados no indican cuál fue, si alguna, la actuación negligente de la doctora Vázquez Latoni. No informan cuál o cuáles fueron las presuntas equivocaciones o desviaciones del estándar de cuidado razonable, o cómo los diagnósticos diferenciales se apartaron de una atención médica adecuada. El perito de la parte apelada meramente esbozó conjeturas generales sobre una supuesta negligencia médica conformada a su criterio personal.

Si bien es cierto que la doctora Vázquez Latoni no revisó el expediente médico a su llegada, ambos galenos apelantes testificaron que la entrega se hizo de manera verbal, lo cual resulta ser una práctica aceptable entre hospitales, según confirmado por los peritos de ambas partes[89]. Surge que, de esta conversación, el doctor Colón Bermúdez le informó a la doctora apelante que la paciente mostraba niveles críticos de hemoglobina, pero que se encontraba en proceso de comenzar a recibir la transfusión de sangre que él había ordenado de manera inmediata, y que había colocado una consulta con el médico internista de la paciente. Lo medular en esta transición era que la galena quedara advertida sobre la condición de la paciente y del plan de tratamiento pendiente. Así ocurrió en el presente caso, pues así lo documentó la doctora Vázquez Latoni posteriormente.

Adicionalmente, pudimos apreciar que, al momento en que la doctora apelante entró a su turno, el personal de enfermería en efecto se encontraba en trámites para solicitar las unidades de sangre con el laboratorio, el cual, a su vez, había ordenado la repetición de la muestra de *type and screen*. Además, de igual manera, a la paciente se le tomaron los signos vitales mientras la doctora Vázquez Latoni se encontraba en turno, y aunque mostró algunos parámetros anormales y se documentó que se

---

[89] *Véase*, TPO de 4 de abril de 2024, a la pág. 96.

mostraba algo desorientada y agresiva, poco hizo el personal de enfermería en informar de tal estado a la doctora de turno.

De hecho, no fue hasta que comenzó la transfusión, y pasados diez minutos, que las enfermeras procuraron la intervención de la doctora apelante ante el cambio en estado mental de la paciente; en particular, cuando esta última se despojó de la línea de transfusión. Ante estos hechos, apoyados en la prueba documental y testimonial, somos del criterio de que no existía trámite ulterior que la doctora Vázquez Latoni pudiese añadir al inicio de su turno para agilizar el proceso de transfusión, y que esta intervino según fue informada por el doctor Colón Bermúdez y el personal de enfermería.

Quedó meridianamente claro que la doctora Vázquez Latoni actuó amparada en los estándares de cuidado médico razonable al tranquilizar a la paciente para facilitar la continuación de la transfusión de sangre. Además, no podemos sino coincidir en que la orden del *CT Scan* corresponde a una evaluación diferencial que no incidía sobre el tratamiento prescrito, y cuya presunción de corrección no fue rebatida por la parte apelada.

Aún más determinante resulta que el cambio de conducta en la paciente se debió a la dilación en el comienzo del tratamiento con unidades de sangre, lo cual constatamos que se debió a actos u omisiones previos y ajenos a la doctora apelante. Por tal razón, no podemos sino coincidir con la contención de la doctora apelante en cuanto a que, al momento de su intervención, doña Tomasa se encontraba en un estado crítico e irreparable, el cual la doctora Vázquez Latoni no hubiese podido revertir durante la corta intervención que tuvo con la paciente. Máxime, cuando el personal de enfermería no procuró diligentemente la intervención de esta luego de monitorear a la paciente.

Por lo tanto, el foro apelado incidió al imputarle negligencia a la doctora Vázquez Latoni por el modo en que los galenos eligieron para informar el cuadro clínico de doña Tomasa, toda vez que esta estuvo

informada del plan de manejo pendiente y en curso de ejecución, cuya dilación no era atribuible a los actos de la galena.

A igual conclusión llegamos luego de analizar la controversia señalada sobre las órdenes impartidas por la doctora apelante para tranquilizar a doña Tomasa e investigar la causa de su cambio de sensorio. Por lo tanto, concluimos que los actos o las presuntas omisiones de la doctora Vázquez Latoni no fueron la causa próxima del fallecimiento de doña Tomasa, por lo que la doctora apelante no responde por los daños reclamados.

iii

Finalmente, no podemos disponer del caso sin antes resaltar que, en nuestro ordenamiento jurídico, el deber de cuidado hacia los pacientes no corresponde solamente a los médicos, sino también al hospital[90]. Así, el hospital responde por los daños reclamados cuando su personal incumple con dicho deber para con el perjudicado[91]. Por lo tanto, el personal de enfermería de un hospital debe ejercer un grado de cuidado razonable propio de su profesión, con el fin de evitar un daño innecesario al paciente[92].

Aún más, las enfermeras tienen un deber insoslayable de realizar y llevar a cabo, con la urgencia requerida y conforme a las circunstancias particulares de cada paciente, las órdenes médicas[93]. Además, en la medida en que las enfermeras son el único medio de comunicación entre el médico y el paciente en muchas ocasiones, estas tienen una obligación con el médico de llevar a su atención los síntomas o quejas de los pacientes bajo su cuidado[94].

En este caso, no está en controversia la negligencia imputada al personal hospitalario del MMC. En específico, el Tribunal de Primera

---

[90] *Núñez v. Cintrón*, 115 DPR 598, 605 (1984).

[91] *Íd.*, a la pág. 613.

[92] *Blás v. Hosp. Guadalupe*, 146 DPR 267, 307 (1998).

[93] *Íd.*

[94] *Íd.*, citando a *Reyes v. Phoenix Assurance Co.*, 100 DPR 871, 881-882 (1972).

Instancia le imputó negligencia a dicho personal ante la dilación en el cumplimiento de las órdenes médicas impartidas y necesarias para el tratamiento de doña Tomasa.

No albergamos duda alguna en cuanto a que la prueba desfilada demostró de manera consecuente que el personal de enfermería del MMC cumplió tardíamente con varias de las órdenes medicas iniciales y asertivas que emitió el doctor Colón Bermúdez, obviando la urgencia que ameritaba el cuadro clínico de la paciente. Es decir, las enfermeras a cargo del cuidado de la paciente incumplieron reiteradamente con una serie de órdenes médicas legítimas, apropiadas, claras y terminantes. No vemos en la prueba razón alguna por la que resultara imposible cumplir con las órdenes de manera inmediata.

Inclusive, a pesar de que el expediente médico refleja que se había liberado los resultados de *type and screen* a eso de las 2:07 am del 19 de julio de 2019, no surge que el personal de enfermería hubiese hecho trámite alguno para agilizar el proceso de solicitud de unidades de sangre. De hecho, no fue sino hasta las 7:10 am que el personal orientó y tomó el consentimiento de la paciente para la transfusión de sangre[95]. Posterior a esto, decidieron llamar al laboratorio, quien ordenó otra muestra de *type and screen*, obviando la ya existente y dilatando aún más el proceso.

Ahora bien, un análisis detenido de la totalidad de la prueba nos confirma que el personal de enfermería del MMC no solo incumplió con la ejecución diligente de las órdenes médicas, sino que tampoco ejerció su obligación de informar oportunamente sobre el estado en que se encontraba la paciente a los galenos de turno. Después de todo, las enfermeras del MMC eran el medio de comunicación directo entre la paciente y los doctores apelantes.

No obstante, surge que estas no comunicaban las quejas de la paciente y de sus familiares a los doctores, no notificaron la consulta al

---

[95] *Véase*, apéndice del recurso KLAN202500515, a la pág. 372.

médico internista y, mucho menos, notificaron con premura el cambio anormal de sus signos vitales o del estado mental de la paciente.

Ante lo antes expuesto, nos es forzoso concluir que, por la negligencia combinada en el manejo y tratamiento de doña Tomasa, solamente son responsables el MMC y el doctor Colón Bermúdez. El MMC fue negligente por la falta de comunicación y la desatención reiterada e injustificada de las órdenes médicas impartidas, en clara desviación del deber de cuidado que exige su profesión.

Aunque en menor proporción que el hospital, el doctor Colón Bermúdez fue negligente en la omisión de emitir órdenes determinantes y necesarias para prescribir oportunamente el tratamiento que requería la paciente, quien tenía una impresión diagnóstica de sangrado gastrointestinal desde su llegada a sala de emergencias.

Por tal razón, nos vemos compelidos a modificar los porcientos de responsabilidad adjudicados por el Tribunal de Primera Instancia de la siguiente manera: el MMC es responsable por los hechos acaecidos en un ochenta por ciento (80%), y el doctor Colón Bermúdez, en un veinte por ciento (20%). En la medida en que la intervención de la doctora Vázquez Latoni no fue la causa próxima del fallecimiento de doña Tomasa, esta no contribuye en ningún grado de responsabilidad por los hechos que desembocaron en la muerte de doña Tomasa.

C

Por último, nos corresponde evaluar si el foro apelado erró al determinar que SIMED responde solidariamente por el pago de la indemnización otorgada a los apelados, de conformidad con los términos y límites de las pólizas suscritas a favor de los médicos apelantes.

Los apelantes aducen que la imposición de responsabilidad solidaria entre SIMED y los doctores asegurados resulta contraria a derecho, pues no existe fundamento contractual ni estatutario para ello. Sostienen que las pólizas no contienen una cláusula de solidaridad, y que el hecho de que se

haya instado la acción contra la aseguradora y sus asegurados no implica la existencia de solidaridad.

Por su parte, los apelados arguyen que los cocausantes de un daño responden frente al perjudicado por la totalidad del mismo. A tales efectos, añaden que cada cocausante tiene disponible una acción de nivelación contra los demás para recobrar lo que haya pagado en exceso al porciento de responsabilidad que le haya sido adjudicado.

Cual citado, en nuestro ordenamiento, la solidaridad entre partes contratantes nunca se presume, sino que la misma debe emanar de un pacto expreso. Así, en la relación contractual entre una aseguradora y su asegurado, es primordial que del contrato de seguros surja claramente la existencia de un pacto expreso a tales efectos.

En este caso, SIMED otorgó a favor de cada uno de los doctores apelantes unas pólizas de seguro, las cuales responderían por la responsabilidad profesional de los galenos hasta un límite de $100,000.00, por incidente médico, y $300,000.00, en agregado anual. Sin embargo, de un análisis sosegado de dichas pólizas no surge la existencia de cláusula alguna mediante la cual SIMED se haya obligado a responder solidariamente por las acciones u omisiones de los galenos asegurados. Por tal razón, y en la medida en que SIMED no es un cocausante del daño reclamado, somos del criterio que la responsabilidad de esta aseguradora no procede de manera solidaria, por lo que el error señalado fue cometido.

IV

Por virtud de los fundamentos expuestos, revocamos aquella parte de la *Sentencia* que impuso responsabilidad solidaria a la aseguradora de los médicos apelantes; modificamos el porciento de responsabilidad impuesto por el foro primario al apelante, Dr. Colón Bermúdez, y lo reducimos a un 20%; aumentamos el porciento de responsabilidad en que incurrió el personal de enfermería del MMC a un 80%; y, en cuanto a la apelante, Dra. Vázquez Latoni, la eximimos de toda responsabilidad por

impericia médica. Así modificada, confirmamos la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala Superior de Mayagüez.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones